UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KENTRELL HARRELL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 11-0989** |
| **N. BURL CAIN, WARDEN.** | **SECTION: "R"(4)** |

**REPORT AND RECOMMENDATION**

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

**I.     Factual Background**

The petitioner, Kentrell Harrell ("Harrell"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On July 31, 2003, a duly impaneled Grand Jury, seated in Orleans Parish, returned a True Bill of Indictment against Harrell for second degree

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2] Rec. Doc. 3.

murder.³ He entered a plea of not guilty to the charge on August 5, 2003.⁴

The record reflects that, on June 8, 2003, at about 9:30 p.m., Caprice Anderson ("Anderson) was shot and killed in front of her grandmother's house at 3110 ½⁵ Lawrence Street in New Orleans.⁶ An autopsy was performed the next day by Dr. Gerald Liuzza, a forensic pathologist. The autopsy revealed that the cause of death was a single gunshot wound to the right side of the forehead. According to Dr. Liuzza, the presence of stippling surrounding the wound indicated that the shot was fired from a few inches away. During the autopsy, Dr. Liuzza retrieved a bullet from Anderson's body. Dr. Liuzza also found bruises on Anderson's legs, arm, and hip.

Although apparently no one witnessed the shooting, two of Anderson's relatives were at the scene within seconds: her uncle, Keith Harris ("Harris"), and her first cousin, Arieal Brewer ("Brewer").

Harris testified that he lived with his mother (Anderson's and Brewer's grandmother) at 3100 ½ Lawrence Street, which is the house in front of which Anderson was shot.

Although Anderson did not live with Harris and her grandmother, she visited almost every day, as her grandmother watched her children. Harris testified that just before the shooting, Anderson was talking on the telephone with his other niece, Brewer. According to Harris, after his nieces concluded their phone call, Brewer waited in the front of their grandmother's house for

---

³St. Rec. Vol. 2 of 7, Indictment, 6/8/03.

⁴St. Rec. Vol. 2 of 7, Minute Entry, 8/5/03.

⁵Although the Louisiana Fourth Circuit opinion states that the shooting occurred at 3110½ Lawrence Street, the trial transcript reveals that the correct address was 3100½ Lawrence Street. St. Rec. Vol. 4 of 7, Trial Transcript, 8/15/06.

⁶The facts and footnotes were taken from the opinion of the Louisiana Fourth Circuit Court of Appeal after Harrell's appeal from the judgment of the Criminal District Court, Orleans Parish. *State v. Harrell*, 965 So. 2d 479 (La. App. 4th Cir. 2007); St. Rec. Vol. 2 of 7, 4th Cir. Opinion, 2007-KA-0202, 8/1/07.

2

Anderson, and he remained in the second room watching television. Harris then heard a shot.

In response to the shot, Harris testified that Brewer opened the front door, ran outside, and yelled to someone three times, "You killed my cousin." Harris, who has an amputated leg, then moved his wheelchair outside the house. Once outside, he saw Brewer "tussling" with Harrell, whom he identified as Anderson's boyfriend. He also saw Anderson lying on the ground. Harris threw himself out of his wheelchair and down the stairs, and he put his head on Anderson's chest. He saw Harrell appear to try to enter Anderson's car, which was parked in front of the grandmother's house and then run from the scene. Harris stated that Harrell's "stepfather" arrived on the scene to check on Anderson, but Harris would not allow the "stepfather" near her.[7]

Brewer, who is Anderson's first cousin, testified that about a week before the shooting, Anderson showed her bruises that she said Harrell had inflicted on her. She stated that Anderson also told her that Harrell had threatened to kill her. Brewer testified that the day before the shooting, Anderson had attended a birthday party for Harrell at his home, and during the party (which Brewer did not attend), Anderson and Harrell argued.

Brewer testified that on the morning of the shooting, she was at her grandmother's house at 3100 ½ Lawrence street. She testified that she saw Anderson's car in front of Harrell's house, which is located down the block from her grandmother's house. Anderson was dropping off Harrell and some of his possessions. Later that day, Brewer testified that Anderson called her and asked her to accompany her to Harrell's house because she was intending to drop off a few more of his possessions, and she wanted Brewer with her in case Harrell became violent. Brewer testified that

---

[7]The man Harris identified as Harrell's stepfather is Darrell Lassere. At the time of the shooting, Lassere, who is an emergency medical technician, was the boyfriend of Harrell's mother. He was living with Harrell's family in a house located down the street from Anderson's grandmother's house.

Anderson asked her to call Harrell's house, and when she did so the line was busy. She testified that Anderson then told her she was on her way to pick her up, and they ended the call. Brewer testified that she remained in the front room near the door, waiting for Anderson, and within thirty seconds she heard a gunshot.

In response to the shot, Brewer testified that she immediately exited the house and saw Anderson lying on the ground. Brewer went to her, and as she was kneeling over Anderson, she noticed Harrell standing nearby, looking around the area where Anderson was lying. She testified that she and Harrell fought, and she told him to leave. She testified that Harrell tried to open the door to Anderson's car, and then he fled from the scene.

Detective Ronald Ruiz, the lead homicide investigator on the case, testified that he arrived at the scene at about 10:10 p.m. When he arrived, he observed Anderson's body lying in the front yard. He identified several photographs of the scene, including one that showed Harrell's house, which, as noted, was located down the block from Anderson's grandmother's house. At the scene, Detective Ruiz spoke with two of Anderson's relatives, Harris and Brewer. They informed him that they were inside of the grandmother's house in front of which Anderson was shot. They further informed him that they heard a gunshot, exited the house and saw Harrell at the scene. Neither Harris nor Brewer saw a gun in Harrell's possession.

Detective Ruiz's partner, Detective Anthony Pardo, assembled photographic lineups containing Harrell's picture.[8] Detective Pardo testified that he showed these lineups to Brewer and Harris, and they both chose Harrell's picture. These lineups were shown separately to Harris and Brewer. They both identified Harrell's photograph from the lineups. Both also gave formal tape-

---

[8]After being shown the police report, Detective Pardo, who testified for the defense, acknowledged that he received Harrell's name as a suspect from Detective Schultz, not Detective Ruiz.

recorded statements.

Officer Michael Hamilton testified that he came to the crime scene to assist in crowd control. As he was leaving the scene, he received a description of the suspect. He also may have been given a name. A few blocks from the scene he spotted Harrell, who fit the description, and whom he knew from previous encounters. Officer Hamilton detained Harrell, who identified himself, and transported him to the police station for questioning. Although Officer Hamilton did not handcuff Harrell, he frisked him and found no weapons.[9]

Approximately two hours after the shooting, Detective Ruiz questioned Harrell at the police station and advised him of his rights. Harrell admitted that he and Anderson were romantically involved. Harrell, however, insisted that they had a good relationship. Denying any domestic violence, Harrell stated that he and Anderson would "play fight" and would give each other "love taps." Harrell stated that he was at home sleeping when he heard the gunshot and that he had just arrived at the scene when Brewer and Harris exited Anderson's grandmother's house. When Detective Ruiz questioned him as to how he arrived at the scene before the others if he was at home sleeping, Harrell replied: "[y]ou won't be able to prove I killed her because there are no witnesses." At that point, Harrell indicated he wanted an attorney, and the questioning stopped.

At the scene, the officers seized one spent nine-millimeter casing. The officers also seized some shoes and men's clothing, as well as copies of a birth certificate and social security card in Harrell's name from Anderson's car, which as noted was parked at the scene. The officers also seized the clothing Harrell was wearing when he was arrested.

Detective Ruiz obtained a search warrant for Harrell's house. Pursuant to this warrant, the

---

[9]Officer Hamilton denied apprehending Harrell in front of Harrell's house or telling Harrell's mother that he was taking Harrell away to keep him safe. Officer Hamilton also denied seeing Harrell at the crime scene.

officers seized nine-millimeter ammunition, a rifle, and some handguns. Detective Ruiz testified that the rifle was seized from the attic. However, he testified that he was unsure from which of the bedrooms the ammunition was seized. He admitted that he did not request that any of the ammunition be tested for fingerprints. Nor did he request that the casing seized from the scene be checked for fingerprints. He explained that he believed it was impractical to get fingerprints off of a fired casing. He also admitted that he did not request that Harrell's hands be tested for gunpowder residue. He explained that the test was very expensive and highly inconclusive.

Detective Ruiz further testified that soon after the murder, the police received information that the person responsible for Anderson's murder could be found in a certain vehicle located on General DeGaulle Drive. He testified that officers stopped the vehicle and detained its occupants. Inside the vehicle the officers found two guns, but the caliber of neither gun was consistent with the nine-millimeter casing found on the scene. The officers thus released the occupants of the vehicle.

Detective Ruiz acknowledged on cross-examination that when he first questioned Harrell, he did not have a waiver of rights form available. He insisted, however, that any statements Harrell made occurred after he had been advised of his rights. Detective Ruiz testified that he did not tape his pre-interview with Harrell. He explained that he intended to tape record any formal statement. However, as noted above, the questioning ceased after Harrell stated he wanted an attorney.

Joseph Allen ("Allen"), an employee in the Clerk's Office property room, testified for the prosecution. Allen identified various documents listing evidence that had been seized in connection with this case. He testified that this evidence was not available for trial because it had been stored in boxes on the floor of the property room and thus some of it was lost in the post-Hurricane Katrina flood. He clarified that some of the evidence had been lost in the flood, while other evidence might

6

have been returned recently from remediation, but the returned evidence had not yet been sorted.

Officer Kenny Leary, an expert in firearms, firearms examination, and ballistics, also testified for the prosecution. Officer Leary testified that about two years after the shooting he tested the nine-millimeter bullet recovered during Anderson's autopsy and the nine-millimeter casing seized at the scene. He also received from Ray Miller, an investigator for the district attorney's office, the rifle that was seized from Harrell's residence.[10] Officer Leary testified that there was no match between the rifle and the casing and bullet. He testified that he did not test any other weapons in connection with this case.

Captain Stephen Gordon testified that he was the commander of the 911 communication center. He testified that information from 911 calls, regular calls to the police, and calls made by police officers were broadcast over the police radio. He identified a 911 report made in connection with this case, and stated that the time of the shooting was listed as 9:30 p.m. He also testified that at 9:37 p.m., information was received via the police radio concerning a suspect fleeing in a white Mitsubishi.

Darrell Lassere ("Lassere"), who was the boyfriend of Harrell's mother, Karen, testified that he, Karen, Harrell, and Harrell's brother lived at 3115 Lawrence at the time Anderson was shot. The night before the shooting, he as well as Anderson attended a birthday party for Harrell at the house. On the night of the shooting, Lassere was lying in bed watching television when he heard a single gunshot. Moments later, he heard a woman shouting. He walked outside to the carport, looked toward 3100 Lawrence, and saw a woman running around outside. He also heard someone ask if anyone had called the police. Lassere walked back inside and called for Harrell, whom he saw walk

---

[10] Allen testified that before the hurricane someone named "R. Miller" had checked out the rifle, but the rifle had not been returned. The rifle, thus, was not lost in the flood.

out of one of the bedrooms. Lassere testified that Harrell and he then walked outside. Lassere remained at the carport while Harrell walked down the street. Lassere heard a woman scream to Harrell: "You did this." Harrell evaded the woman and walked towards Anderson's car, where he tried to open the car door. Harrell then ran back to his house, yelling for his mother. Lassere testified that as Harrell ran past him, Harrell stated: "They shot my old lady in the head."

Lassere, who is an emergency medical technician, grabbed his medical supply bag and ran to the scene, where he found Anderson lying on the ground. He also found Harris lying on the ground near Anderson. However, he did not see Brewer. Lassere testified that he checked Anderson and found no pulse. During this time, Lassere testified that Harrell remained in the area, pacing between his house and the murder scene. Lassere stated that Harrell told officers on the scene that he did not shoot Anderson and that he was at home when the shooting occurred. Lassere testified that Harrell was apprehended on the scene, in his mother's presence, approximately ten minutes after the shooting. Lassere stated that he did not know who owned the guns that were seized from the Harrell's house.

Harrell was tried before a jury and was found guilty as charged on August 18, 2006.[11] He then filed a motion for a new trial and a motion for post-verdict judgment of acquittal, both of which the court denied.[12] On the same day, the court sentenced Harrell to a mandatory life imprisonment in the Department of Corrections at hard labor, without the benefit of probation, parole, or suspension of sentence.[13] Harrell then filed a motion to reconsider the sentence, which the court also

---

[11] St. Rec. Vol. 2 of 7, Minute Entry, 8/18/06, Jury Verdict Form, 8/18/06; St. Rec. Vol. 4 of 7, Trial Transcript, 9/18/06.

[12] St. Rec. Vol. 2 of 7, Sentencing Minutes, 9/25/06; Motion for New Trial, 9/25/06; Motion for Post-Verdict Judgment of Acquittal, 9/25/06.

[13] St. Rec. Vol. 2 of 7, Sentencing Minutes, 9/25/06; St. Rec. Vol. 4 of 7, Sentencing Transcript, 9/25/06.

denied.[14] He further filed a motion for appeal, which the court granted.[15]

On direct appeal to the Louisiana Fourth Circuit Court of Appeal from his conviction in Case 2007-KO-0202, Harrell's counsel raised two assignments of error:[16] (1) the evidence at trial was insufficient to support the verdict; and (2) Harrell was deprived of his fundamental right to a fair trial by "repeated, improper, references to his post-arrest silence and his silence at trial such that a mistrial should have been declared."[17] On August 1, 2007, the Fourth Circuit affirmed Harrell's conviction and sentence, finding that the claims had no merit and/or the claims were in procedural default.[18]

On August 29, 2007, Harrell filed a supervisory writ of review to the Louisiana Supreme Court *pro se*, in which he only argued the evidence put forth at trial was insufficient to support the verdict.[19] On March 28, 2008, the Louisiana Supreme Court denied the writ application without stated reasons.[20] Harrell's conviction became final 90 days later, June 26, 2008, when he did not file a writ of certiorari with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

---

[14]*Id.*

[15]*Id.*

[16]St. Rec. Vol. 4 of 7, 4th Cir. Appeal Brief, 2007-KO-0202, 3/7/07.

[17]*State v. Harrell*, 965 So. 2d at 487; St. Rec. Vol. 2 of 7, 4th Cir. Opinion, 8/1/07.

[18]*Id.*

[19]St. Rec. Vol. 5 of 7, La. S. Ct. Writ Brief.

[20]St. Rec. Vol. 5 of 7, La. S. Ct. Order. 2007-KO-2187, 3/28/08.

## II. State Procedural Background

On August 23, 2009, Harrell submitted an application for a writ of mandamus to the Louisiana Fourth Circuit.[21] He argued that on August 18, 2008, he submitted by mail[22] an application for post-conviction relief with the trial court in which he raised seven claims:[23] (1) the prosecution introduced evidence that had no relevance to the case, which inflamed the jury and directly prejudiced his defense; (2) the trial court allowed the prosecution to enter evidence that could not be supported by physical evidence; (3) the prosecution introduced false and misleading evidence seized from his mother's house; (4) the trial court allowed prejudicial hearsay evidence to be presented to the jury over defenses' objection; (5) he received ineffective assistance of counsel during trial; (6) his right to judicial review was violated due to the absence of portions of the trial court records; and (7) he received ineffective assistance of counsel during his appeal.[24] On September 16, 2009, the Louisiana Fourth Circuit reviewed Harrell's claims *sua sponte* and denied the writ of mandamus, stating that he was not entitled to post conviction relief on the claims presented.[25]

On October 15, 2009, Harrell sought a supervisory writ of review of the Court of Appeals ruling in the Louisiana Supreme Court arguing that the Fourth Circuit had erroneously ruled on the

---

[21]*State v. Harrell*, 978 So. 2d 305 (La. 2008); St. Rec. Vol. 6 of 7, 4th Cir. Mandamus App., 2009-K-1175, 8/23/09 (dated 8/25/09).

[22]*Id.*; Legal/Indigent Mail Request, 8/18/08.

[23]St. Rec. Vol. 6 of 7, Post-Conviction Relief App., 440-910, 8/18/08.

[24]St. Rec. Vol. 6 of 7, Post-Conviction Relief Brief, 440-910, 8/18/08.

[25]St. Rec. Vol. 6 of 7, 4th Cir. Order, 2009-K-1175, 9/16/09.

merit of his claims.[26] On October 1, 2010, the Louisiana Supreme Court denied Harrell's application without stated reasons.[27]

### III. Federal Petition

On April 29, 2011, the clerk of this Court filed Harrell's petition for federal habeas corpus relief in which he raises five claims:[28] (1) the evidence adjudicated at trial was legally insufficient to sustain his conviction for second-degree murder; (2) the prosecution knowingly introduced false and misleading evidence seized from his mother's house; (3) he received ineffective assistance of counsel during trial; (4) his right for appellate review has been violated because a material portion of the record is missing from the trial transcript; and (5) he received ineffective assistance of counsel during appellate review.

In its response in opposition, the State concedes the timeliness of the filing of Harrell's federal habeas petition.[29] The State argues that one of the five claims Harrell asserts, insufficient evidence to sustain the conviction, has been properly exhausted but is nonetheless meritless. However, the State also contends that Harrell's other four claims are unexhausted, which the state assumes would be procedurally defaulted in the state courts by this time.

### IV. General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-

---

[26] St. Rec. Vol. 7 of 7, S. Ct. Writ App., 2009-KH-2295, 10/15/09.

[27] *State v. Harrel1*, 45 So. 3d 1091 (La. 2010); St. Rec. Vol. 7 of 7, S. Ct. Order, 2009-KH-2295, 10/1/10.

[28] Rec. Doc. 3, 3-2. .

[29] Rec. Doc. 14.

132, 110 Stat. 1214,[30] applies to this petition, which is deemed filed in this court under the federal mailbox rule on April 29, 2011.[31] The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In this case, the State concedes, and the Court finds that, Harrell's petition was timely filed. The State argues, however, that Harrell failed to exhaust state court remedies as to four of the five claims raised in his petition. Although the State suggests that the claims may be in procedural default, the State fails to analyze that position. Nevertheless, it is clear from the record that Harrell's petition is a mixed petition, containing both exhausted and unexhausted claims. The Court finds that the mixed petition should be dismissed.

## V.  **Failure to Exhaust**

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief." *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (citing *Rose v. Lundy*, 455 U.S. 509, 519-20 (1982)); *see also Nobles*, 127

---

[30]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[31]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Harrell's federal habeas petition on April 29, 2011, when his motion to proceed *in forma pauperis* was granted. Rec. Doc. 2. Harrell dated his signature on the petition as April 11, 2011. This is presumed to be the earliest date on which he could have submitted the package of the pleadings to prison officials for mailing.

F.3d at 419. "A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims." *Whitehead*, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A)); *see also Rose*, 455 U.S. at 519-20.

The well-established test for exhaustion requires that the substance of the federal habeas claim be fairly presented to the highest state court. *Whitehead*, 157 F.3d at 387 (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." *Whitehead*, 157 F.3d at 387 (citing *Picard*, 404 U.S. at 275-78). "This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application." *Whitehead*, 157 F.3d at 387 (citing *Nobles*, 127 F.3d at 420); *see also Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001).

For exhaustion purposes, it also is not enough for a petitioner to have raised the claims in a state court if it was not specifically raised at each level of the state courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("the prisoner must 'fairly present' his claim in each appropriate state court"). Furthermore, a prisoner does not fairly present a claim to the state's highest court if that court must read beyond the petition or brief, such as a lower court opinion, to find a claim not otherwise specifically raised. *Id*. at 32.

In this case, the record shows that Harrell's first federal claim, insufficient evidence to withstand the verdict, has been specifically raised at each level of the state courts. The claim was

13

presented on direct appeal to the Louisiana Fourth Circuit and to the Louisiana Supreme Court on review from the appeal. Therefore, the claim has been fully exhausted for federal habeas purposes.

As for federal claims two through five, the record shows that Harrell mailed a post-conviction relief application to the state District Court, which included these federal habeas claims. After about a year, without a ruling from the District Court, Harrell applied for a writ of mandamus to the Fourth Circuit requesting the court to instruct the District Court to rule on his petition. The Fourth Circuit, however, *sua sponte* denied Harrell's application and stated that he was not entitled to post conviction relief on the claims presented.

Harrell sought a supervisory writ with the Louisiana Supreme Court in which he only presented the question of whether the Fourth Circuit erroneously denied his writ of mandamus and exceeded its lawful jurisdiction in passing judgment upon the merits of the post-conviction application. No where in his application did he raise any substantive issues or ask the Supreme Court to review the merits of his federal claims.

A petitioner fails to satisfy the exhaustion requirement where he "advances in federal court an argument based on a legal theory distinct from that relied upon in the state court." *Wilder*, 274 F.3d at 259. Thus, Harrell's failure to fairly present four of the five federal claims to each level of the Louisiana Courts in a procedurally proper manner renders the claims unexhuasted. *See Wilder*, 274 F.3d at 259; *Baldwin*, 541 U.S. at 29.

The record discloses no good cause for his failure to properly and fully exhaust his claims in the state courts, and the Court can find none from its review of the record. *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). Therefore, Harrell's mixed petition, presenting both exhausted and unexhausted claims, should be dismissed without prejudice to allow him to pursue complete

exhaustion, unless he chooses to dismiss all of the unexhausted claims and proceed only with the one exhausted claim. *Pliler v. Ford*, 542 U.S. 225, 233 (2004) (quoting *Rose*, 455 U.S. at 510); *Whitehead*, 157 F.3d at 387.

## VI. Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Kentrell Harrell's petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust state court remedies.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[32]

New Orleans, Louisiana, this 9th day of August, 2012.

.

                              **KAREN WELLS ROBY**
                 **UNITED STATES MAGISTRATE JUDGE**

---

[32]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.